UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| DENNIS HOTHEM and KENDELL STEVENS, | ) ) ) | CIV. 10-5020-JLV |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **REPORT AND RECOMMENDATION** |
| DAVE SCHNEIDER, individually and as Mayor, and the CITY OF BELLE FOURCHE, SOUTH DAKOTA, | ) ) ) ) | |
| Defendants. | ) ) | |

**TABLE OF CONTENTS**

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3-23

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-70

    A.     Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . 24-26

    B.     The City of Belle Fourche's Motion for Summary Judgment . 26-65

          1.    Age Discrimination in Employment Act . . . . . . . . . . . . 26-54

              a.   Direct Evidence of ADEA Discrimination . . . . . . 27-30

              b.   Indirect Evidence of ADEA Discrimination . . . . . 30-53

                  i.    Whether Mr. Hothem and Mr. Stevens were meeting the city's reasonable expectations at the time of their termination . . . . . . . . . . . . . . . . . . . . . 31-34

                  ii.   Whether Mr. Hothem and Mr. Stevens were replaced by someone substantially younger . . . . . . . . . . . . . . . . . . . . . . . . 34-45

                  iii.   Whether the city had a legitimate nondiscriminatory reason for

                                    terminating Mr. Hothem and Mr. Stevens . 45-46

               iv.      Whether the city's proffered reasons
                            are mere pretext . . . . . . . . . . . . . . . . . . 46-53

           c.      Disparate Impact Age-Discrimination . . . . . . . . .53-54

      2.      42 U.S.C. § 1983 Liability . . . . . . . . . . . . . . . . . . . . . . 54-63

      3.      Wrongful Discharge - Violation of Public Policy . . . . . . 63-65

  C.      Mayor Dave Schneider's Motion for Summary Judgment. . . . 66-70

      1.      Liability of Mayor Schneider Under 42 U.S.C. § 1983. . 66-67

      2.      Liability of Mayor Schneider Under the ADEA . . . . . . . 68-70

      3.      Liability of Mayor Schneider for Wrongful
              Discharge - Violation of Public Policy . . . . . . . . . . . . .   70

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70-71

NOTICE TO PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   71

## INTRODUCTION

Plaintiffs Dennis Hothem and Kendell Stevens filed this lawsuit, invoking this court's federal question jurisdiction under 29 U.S.C. §§ 621-34 and 42 U.S.C. § 1983, and alleging that defendants Dave Schneider, individually and as Mayor, and the city of Belle Fourche engaged in age discrimination (29 U.S.C. §§ 621-34), a violation of plaintiffs' civil rights (42 U.S.C. § 1983), and wrongful discharge in violation of South Dakota public policy.  See Docket No. 1.  Pending before the court are motions for summary judgement filed by both defendants.  See Docket Nos. 47, 57.  The district court, the Honorable Jeffrey L. Viken, referred these motions to this magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  See Docket No. 82.

2

**MATERIAL FACTS**

Plaintiff Dennis Hothem was employed by the city of Belle Fourche from 1993 until 2001, as the maintenance supervisor and director of the Belle Fourche City Recreational Center.  See Docket No. 87 at ¶ 1.  At the request of Mayor Dave Schneider, Mr. Hothem returned to employment with the city in January of 2006 as the supervisor of a newly-formed municipal custodial/maintenance department.  Id. at ¶ 2.  Mr. Hothem was hired by the Belle Fourche City Council upon the recommendation of David Pummel, T.R. Bennett, and Rex Corliss - three members of the city legal/finance committee.  See Docket No. 86 at ¶ 3.  At the time Mr. Hothem was hired in 2006 he was 59 years old. See Docket No. 86 at ¶ 6.  After Mr Hothem was hired, he reported to directly to Mayor Schneider until April of 2009 when he began reporting to Councilmember David Pummel, chair of the Legal Finance Committee.  See Docket No. 87 at ¶ 3.

Plaintiff Kendell Stevens was hired as the assistant working maintenance supervisor on December 3, 2007.  See Docket No. 87 at ¶ 4.  Mr. Stevens was hired by the council upon the recommendation of the same individuals who recommended Mr. Hothem.  See Docket No. 86 at ¶ 8.  At the time Mr. Stevens was hired in 2007 he was 59 (almost 60) years old.  See Docket No. 86 at ¶ 7. As the working assistant, Mr. Stevens was non-exempt and performed the same duties as other employees–mopping, dusting, waxing, set up, hauling,

cleaning, taking care of the HVAC systems, and changing filters.  Id. at ¶ 5.
Mr. Stevens also testified during his deposition that he had administrative
duties that included helping Mr. Hothem prepare the budget, supervising other
employees, and supervising contractors.  See Docket No. 53-31 at pages 4-5
(Stevens Depo. at 28-31).

Mr. Pummel, as a member of the committee for custodial maintenance,
evaluated Mr. Hothem's performance in December of 2007.  See Docket No. 87
at ¶ 6.  Mr. Pummel gave Mr. Hothem an overall evaluation of 4 out of 5, noting
that Mr. Hothem was very accurate and thorough, always completed his work,
was highly resourceful, had excellent attendance, and outstanding
communications.  Id.  Mr. Pummel again evaluated Mr. Hothem's performance
in October of 2008, giving Mr. Hothem an overall evaluation of 5 and rated him
5 in every category except relations, where he received a 3 rating.  Id. at ¶ 7.
Mr. Pummel did not forward the October 2008 evaluation to personnel until
November 21, 2008.  Id. at ¶ 8.  Mr. Pummel performed no further evaluation
of Mr. Hothem after the October 2008 evaluation, nor did Mr. Pummel issue
any warnings or written reprimands.  Id. at ¶ 11.

Mr. Hothem performed evaluations of Mr. Stevens in 2008 and 2009,
giving Mr. Stevens an overall evaluation of 4 out of 5.  See Docket No. 87 at
¶ 10.  Neither Mr. Hothem's nor Mr. Stevens' personnel files contain any

reprimands, suspensions, or disciplinary action of any kind.  See Docket No. 87 at ¶ 12.

From the time Mr. Hothem was hired in 2006, he reported directly to Mayor Schneider.  Id. at ¶ 3.  In April of 2009, Mayor Schneider met with Mr. Hothem and told him that the city council did not want Mayor Schneider to have direct contact with any department heads.  See Docket No. 86 at ¶ 24. Evidently, the council believed that Mayor Schneider was overstepping his authority in contacting department heads directly about department business. Id.  From that point forward, Mr. Hothem reported to Mr. Pummel.  Id. Mr. Hothem testified that even after April of 2009 Mayor Schneider continued to be friendly when they ran across each other.  Id. at ¶ 25.

Mr. Stevens, while working for the city, had no work contact with Mayor Schneider. Id. at ¶ 26.  The extent of Mr. Stevens' relationship with Mayor Schneider was saying "good morning" or "good afternoon."  Id. (Stevens' Depo. at 42-43).  Mr. Stevens testified that he had no contact at all with Mr. Pummel.  Id.

In the fall of 2008, Mayor Schneider asked Mr. Hothem to help remove tile in one of the non-carpeted rooms at the police station.  See Docket No. 86 at ¶ 14 (Hothem Depo. at 114-19).  Mr. Hothem testified that he could tell that the tile was made from asbestos, that he was aware of the dangers of asbestos exposure, and was aware of the requirement to follow state law prior to

removing any asbestos materials.  Id. at ¶ 15 (Hothem Depo. at 114-19).

Mr. Hothem did not want to remove the asbestos tiles and recommended a

professional be hired to do the work because asbestos was dangerous and he

did not think it was a very good idea.  See Docket Nos. 86 at ¶ 16; 53-12 at

page 17 (Hothem Depo. at 118-19).  Mr. Hothem testified that Mayor Schneider

told him that removing the tile was a small, insignificant job and, therefore, a

professional did not need to be hired.  See Docket No. 86 at ¶ 17 (Hothem

Depo. at 114-19).  Thereafter, Mr. Hothem helped Mayor Schneider break up,

remove, and dispose of the tiles.  Id.

On January 31, 2008, the South Dakota Department of Energy and

Natural Resources ("DENR") received a complaint alleging that asbestos tiles

had been improperly removed at the city's police station.  See Docket No. 60-2.

The DENR sent Doug Baldwin, and Environmental Project Scientist, to

investigate the complaint.  Id.  Mr. Baldwin visited the city's police station,

spoke with Mr. Hothem and other city employees, and prepared a report which

was submitted to the DENR.  Id.  According to Erin Schmidt, an

Environmental Program Scientist with the DENR, following the completion of

Mr. Baldwin's investigation and report, the DENR did not issue any notice of

violation, written reprimand, nor was any type of disciplinary action taken against the city.[1]  See Docket No. 60 at ¶ 7.

Again, in the spring of 2009, the city decided to remove carpet and tile from other rooms in the police station.  See Docket No. 86 at ¶ 18 (Hothem Depo. at 120-24).  At this time, Mr. Hothem obtained bids from two professional asbestos removers.[2]  See Docket No. 86 at ¶ 19 (Hothem Depo. at 120-121).  Mr. Hothem testified that he remembered one quote being $14,000.[3]  Id.  Mr. Hothem submitted the bids to Mayor Schneider who indicated that he did not think the city could afford to pay that kind of money.  See Docket No.

_____

[1] Mr. Hothem and Mr. Stevens assert that while Ms. Schmidt claims that no reprimand or disciplinary action was taken against the city, DENR specifically instructed the city to perform air monitoring and to utilize a certified asbestos remover should the city plan to remove any additional asbestos.  See Docket No. 101 at ¶ 14 (Plaintiff's Response).  However, the relevant document does not state that DENR instructed the city to perform air monitoring or to have a certified asbestos remover; rather, it states that the city was monitoring the air and that if it proceeded with its plan to recover the floor it would work with a certified asbestos handler.  See Docket No. 60-2.

[2] Mr. Hothem testified that he was asked to remove carpeting in the fall of 2008 and again in June of 2009.  See Docket No. 53-12 at page 14 (Hothem Depo. at 80).  It was during the June 2009 occasion that Mr. Hothem asserts he obtained bids for removing the asbestos.  Id. at page 17 (Hothem Depo. at 120-121).  However, Mr. Hothem's assertion that he obtained bids for asbestos removal in the Spring of 2009 is inconsistent with the bids obtained, which indicate that they were given in July and August of 2008.  See Docket No. 74-4 at pages 12-13.  Additionally, a fax from the DENR containing instructions for removing asbestos tiles was sent on January 7, 2008.  See Docket No. 60-1

[3] Mr. Hothem and Mr. Stevens assert in their response to the city's statement of material facts that the bids were actually $11,000 and $11,820.  See Docket No. 86 at ¶ 19 (plaintiffs' response).

86 at ¶ 20.  Mayor Schneider told Mr. Hothem to show the bids to Mr. Pummel.
Id.  In response to showing Mr. Pummel the quotes for asbestos removal,
Mr. Pummel said "we're not going to pay $14,000 for asbestos removal.  This is
an insignificant job."  See Docket No. 53-12 at page 18 (Hothem Depo. at 122).
Mr. Hothem testified that there was no friction between Mayor Schneider and
himself when they were talking about the quotes and that he did not seem
upset and only said that the "city couldn't afford to do that."  Id. (Hothem
Depo. at 124).  Mr. Hothem also indicated that Mr. Pummel was not upset with
him when they were discussing the quotes for asbestos removal.  Id.

Mr. Hothem testified that he never contacted the state regarding the
work that he was doing and did not ask anybody to call the state.  See Docket
No. 53-12 at page 19 (Hothem Depo. at 125-26).  Mr. Stevens testified that the
only call that was made was to determine the proper procedure for removing
the tiles.[4]  See Docket No. 53-13 at page 9 (Stevens Depo. at 56).  Although
Mr. Hothem and Mr. Stevens did not make any outside complaints about
asbestos removal, two other citizens called to complain about the dust caused
by removing the tile at the police station.[5]  See Docket No. 87 at ¶ 137.

---

[4] The call to the South Dakota Department of Energy and Natural
Resources was apparently made in January of 2008 as the fax containing
instructions for removal was dated January 7, 2008.  See Docket No. 60-1.

[5] The two individuals who called to complain were Larry Rohl and Nicole
Shiffrar.  At a grievance hearing for Nicole Shiffrar on September 21, 2009,
Officer Larry Rohl was questioned by Mayor Schneider and testified that he

On August 25, 2009, Ms. Schmidt, from DENR, spoke with Mr. Hothem about the carpet that had been removed from the police station.  See Docket No. 60 at ¶ 9.  This was in response to the complaint lodged by Nicole Shiffrar, the former secretary at the city's police station.  Id. at ¶ 8.  Ms. Schmidt indicated that Ms. Shiffrar told her that an additional three rooms of floor tiles had been removed by way of an electric chipper and that it had created "extreme amounts of dust."  Id.  Ms. Schmidt said that when she spoke with Mr. Hothem, he told her that "only four or five floor tiles had come up with the carpet," that "no chipper had been used and no floor tiles were removed." [6]  Id. at ¶ 9  Ms. Schmidt further indicated that Mr. Hothem invited her "to come to the building to look for [herself] to confirm what he was stating was true."  Id. Ms. Schmidt also followed up with Chief of Police Tom Maunders on August 26,

---

called the DENR after he drove by and saw Mayor Schneider removing the tiles and just figured they contained asbestos.  See Docket No. 76-2 at page 10-11. Officer Rohl did not testify that he saw dust.  Id.  Officer Rohl also testified at the grievance hearing that Nicole Shiffrar was the other individual who called DENR.  Id.  Mr. Hothem and Mr. Stevens also cite to Docket No. 74-4 as evidence that another individual called to complain about dust.  See Docket No. 87 at ¶ 137.  However, the citation refers to a memo from Martha Wierzbicki and only says that she *received* a call from DENR inquiring about removal of asbestos floor tiles, it does not indicate who called to complain nor does it mention anything about dust.  See Docket No. 74-4 at page 21.

[6] Mr. Hothem's testimony appears to differ from Ms. Schmidt's recollection.  Mr. Hothem's deposition testimony indicates that Hills Interiors, who had the contract with the city to put in new carpet, rented a machine and took the tile out.  See Docket No. 53-12 at page 19 (Hothem Depo. at 126-27).

2009, who confirmed what she had been told by Mr. Hothem the previous day.[7] Id. at ¶ 10.  According to Ms. Schmidt, no notice of violation, written reprimand, or any other type of disciplinary action or sanction was issued against the city as a result of the August 2009 incident.  Id. at ¶ 12.

In August of 2009, Martha Wierzbicki, a Belle Fourche building inspector, received a phone call from the DENR about removal of asbestos from the police station.  See Docket No. 86 at ¶ 27.  On August 25, 2009, Ms. Wierzbicki prepared a memo which was routed to Mayor Schneider and the council indicating that she had received a call from DENR regarding the removal of asbestos tiles from the police station, that this was the first she had heard of it, that procedures established by the state for inspection/removal of asbestos must be followed, and requesting that all renovations, building and demolishing of city buildings go through her office.  Id.

Mayor Schneider questioned Officer Larry Rohlf on September 21, 2009, regarding his report to the DENR that asbestos was being removed from the police station.  See Docket No. 87 at ¶ 140.  Mr. Hothem testified that Mayor Schneider never told him anything or gave him reason to believe that he was upset that someone had talked to the state about the asbestos removal.  See Docket No. 53-12 at page 29 (Hothem Depo. at 217).

_____

[7] Ms. Schmidt said that Chief Maunders told her that the report was likely lodged by a disgruntled former employee.  See Docket No. 60 at ¶ 11.

In May or June of 2009, Mr. Hothem was called into an executive session with the city council.  <u>See</u> Docket No. 87 at ¶ 22.  The purpose of the meeting was primarily an evaluation of the maintenance department.  <u>See</u> Docket No. 53-14 at page 3 (Pummel Depo. at 19).  Mr. Pummel testified that "there was a lot of concern about the maintenance department."  <u>Id.</u>  Mr. Pummel said that Mr. Hothem and his department were not doing "that bad" with maintenance upkeep until Mr. Pummel denied Mr. Hothem's request for a raise in the fall of 2008.  <u>Id.</u> at page 6 (Pummel Depo. at 34-36).  Mr. Pummel said that he had received "a lot of complaints from the other department heads about them" and that the meeting was held to discuss those complaints with Mr. Hothem.  <u>Id.</u> Mr. Hothem and Mr. Stevens deny that there had been several complaints about the department by other department heads.  <u>See</u> Docket No. 86 at ¶ 29 (Plaintiffs' response).  From Mr. Pummel's deposition testimony, it appears that there were concerns about the recreation center, concerns about the cleaning of city hall, and a complaint by Chief Maunders of the police department.  <u>See</u> Docket No. 53-14 at page 3 (Pummel Depo. at 19-20).

At the meeting with Mr. Hothem, the Council asked for improvement in cleaning at the recreation center and the police station and changes in scheduling.  <u>See</u> Docket No. 53-12 at page 13 (Hothem Depo. at 74-76).  Mr. Hothem testified that the meeting was "rather heated" with council members asking him question after question without allowing him time to

respond.  Id.  However, Mr. Hothem agreed that changes needed to be made in the maintenance department to improve.  Id.  (Hothem Depo. at 76).  Following the meeting, Mr. Hothem testified that he provided every city council member with a detailed list of activities and actions performed every month.  See Docket No. 87 at ¶ 39.

A meeting with Mr. Hothem appears to have been scheduled for June 15, 2009, to follow up on the points discussed at the executive session and to check on the progress of the custodial/maintenance department.  See Docket No. 78-2 at page 4.  Mr. Hothem recalled that no follow-up meeting ever took place.  See Docket No. 87 at ¶ 35.  Council members Pummel and Moncur testified that they believed a follow-up meeting was held, although they could not remember when, but that they did not see any improvement.  See Docket Nos. 73-3 at page 8 (Pummel Depo. at 37); 53-15 at page 2 (Moncur Depo. at page 7).  Council member McElwain testified that although she recalled the executive session with Mr. Hothem, she did not recall ever holding a follow-up meeting with Mr. Hothem but she believed any follow-up would have come from the Human Resources committee.  See Docket No. 73-6 at pages 4-5 (McElwain Depo. at 32-33).  Mr. Hothem asserts that the department was improving. Mr. Hothem testified that he asked councilman Tim Bennett about what the feeling of the council was with regards to any improvements and that

Mr. Bennett replied that they were doing better.  See Docket No. 53-12 at page 14 (Hothem Depo. at 77-78).

In the first quarter of 2009, Gloria Landphere, the City Finance Officer, saw that the recession was decreasing the city's sales tax revenues.  See Docket No. 86 at ¶ 32.  As a result, in May of 2009, the city directed all department heads to cut 5% from their 2009 budgets.[8]  Id.  Mr. Hothem testified that before the cut they were already running at a "bare minimum." Id. (Hothem Depo. at 141-42).

In August of 2009, the city started working on the budget for 2010.  See Docket No. 86 at ¶ 33.  Gloria Landphere prepared a 2010 budget, which included a voluntary 3% cost of living raise that would increase expenditures approximately $54,000,[9] an increase in health insurance, an increase in worker's compensation premiums, and an increase in the cost of liability insurance.  Id.  As part of the budget, Kellie Pummel, the city's insurance

---

[8] In January of 2009, Mayor Schneider directed each department head to prepare a budget with 5% and 10% reductions.  See Docket No. 87 at ¶ 15. The budget cuts were not to go into effect until department heads were told to implement them.  See Docket No. 53-12 at 21 (Hothem Depo. at 141-42).  With regards to the 5% budget cut, Mr. Hothem prepared his budget, finding the appropriate amounts in budget savings.  Id. at ¶ 16. Gloria Landphere told Mr. Pummel that Mr. Hothem was doing a good job with his budget. Id. at ¶ 17.

[9] The 3% cost of living increase was voluntary.  Mayor Schneider vetoed the 3% raise, but the council overrode the veto in a city council meeting on September 21, 2009.  See Docket No. 76-3 at page 21 (BF Hothem/Stevens 1229).

13

agent, provided health insurance quote coverage to the city.  See Docket No. 87 at ¶ 47.  The provided quote coverage highlighted the cost of insurance and the age brackets 55-64.[10]  Id.   Additionally, by way of e-mail, Ms. Landphere told Mr. Pummel that she had gone through the insurance numbers person by person, apparently at Mr. Pummel's request.  See Docket No. 77-4 at page 25.

Ms. Landphere's budget forecasted a short-fall of revenues and a budget deficit in the general fund, although the actual amount of the deficit is disputed between the parties.  Id. at ¶ 33.  Mr. Hothem believed that the city was in fact experiencing decreased sales tax revenues and budget constraints and that it was Ms. Landphere's job to make calculations to reduce any projected budget deficit.  Id. at ¶¶ 34-35 (Hothem Depo. at 146-47).

Mr. Pummel asked Ms. Landphere in August of 2009, while Ms. Landphere was working on the 2010 budget, to calculate the potential savings if the city restructured the custodial/maintenance department and placed that department within or under the public works department, eliminated Mr. Hothem's and Mr. Stevens' positions, and library and

---

[10] Mr. Hothem and Mr. Stevens allege that Kellie Pummel highlighted the costs of insurance of those individuals that fell within the age bracket 55-64. The city argues that there is no evidence as to who highlighted portions of the document or when portions of the document were highlighted.

14

engineering employees were terminated or their hours were reduced.[11]  <u>See</u> Docket No. 51 at ¶ 5 (Landphere Affid.).

On September 8, 2009, at a regular council meeting, the minutes reflect that the following actions were passed. First, the $196,000 requested by dispatch was reduced by $14,169 to arrive at a new amount of $181,830.  This reflected an increase of 5% over the previous year's budget.  Second, the library staff was reduced to 2 full-time employees (40 hours per week), 1 regular part-time employee (35 hours per week), 1 part-time employee (19 3/4 hours per week).  The sum of $7,000 was added for acquiring books.  It was projected that this would save approximately $25,000 to the general fund.  Third, the City Building Maintenance Supervisor (Dennis Hothem) and the Assistant Supervisor (Kendall Stevens) positions were eliminated and the maintenance

―――――――――――――――

[11] In late August and early September of 2009 Mr. Pummel discussed, through e-mail, with other counsel members about what cuts needed to be made, including cuts to dispatch, the library, wages, and maintenance.  <u>See</u> Docket No. 90-4.

The parties dispute certain facts relating the city's decision to restructure the custodial/maintenance department and savings associated with the city's 2010 budget plan.  The city asserts that the decision to restructure the custodial/maintenance department and to transfer some duties to the public works department would save taxpayers approximately $37,754.54.  <u>See</u> Docket No. 86 at ¶ 37 (Landphere Affid.).  Mr. Hothem and Mr. Stevens assert that Ms. Landphere's calculations were not correct when they were made and that they were not correct in hindsight because the stated cost savings plan was either not carried out or the decisions made at the September 8 and 14, 2009 meetings were not permanent.  <u>See</u> Docket No. 86 at ¶ 37 (Hothem/Stevens Response).

department was restructured under the Public Works Department.  Fourth, the Engineering Secretary position was changed from a full-time (40 hours per week) position to a part-time (19 3/4 hours per week) position.  And fifth, discussions were held regarding health insurance premiums.  See Docket No. 53-6.

Mr. Hothem and Mr. Stevens argue that although their positions were officially terminated on September 8, 2009, the decision to terminate Mr. Hothem and Mr. Stevens was made in August by Mr. Pummel, Ms. McElwain, and Mr. Hendrickson and then shared with Betty Jo Jorgenson and Dirk Hoffman, and that their replacements were already in the works.[12]  Id. (Plaintiffs' response).

The city council met again in a special budget work session on September 14, 2009.  See Docket No. 53-7.  At that meeting, the council

_____

[12] As evidence of this, Mr. Hothem and Mr. Stevens point to several e-mail exchanges that took place in August of 2009 between Mr. Pummel and Ms. McElwain regarding restructuring of the custodial/maintenance department under the public works department.  See Docket No. 77-4 at pages 8-9.  Mr. Hothem and Mr. Stevens also cite e-mail exchanges between Mr. Pummel and Ms. Jorgensen regarding the restructuring and the fact that Mayor Schneider was either opposed to restructuring the custodial/maintenance department or opposed to terminating Mr. Hothem.  Id. at pages 32-33.  However, these latter communications took place after the September 8, 2008, meeting and thus provide little support for the assertion that the replacements were in the works in August as Mr. Hothem and Mr. Stevens assert. Id.

decided to reduce the library staff by only 1 full-time position.[13]  The council also decided that the hours for the Engineering Secretary position would be 30 hours per week instead of 19 3/4 hours.[14]  The council also reduced one finance staff member's hours from 40 to 35 hours per week.  As to the maintenance department, the council decided to keep the maintenance department, including the City Building Maintenance Supervisor and Assistant Supervisor positions in place through December 31, 2009.  Then, on January 1, 2010, the maintenance department would be under the direction of public works.  Finally, the council decided that health insurance would be reduced 10% for the next three years for dependents to:  95% employees/85% dependants for the year 2010, 95% employee/75% dependants for the year 2011, 95% employees/65% for dependants for the year 2012, with a 3% increase in wages.  Id.

Mr. Hothem was in attendance at both the September 8 and 14, 2009, meetings.  See Docket No. 86 at ¶ 46.  When asked whether Mr. Pummel made any "negative comments about [Mr. Hothem] or Mr. Stevens at either of [the] meetings," Mr. Hothem testified, "I don't recall that he did.  I believe the reason

_____

[13] This was a change from the September 8, 2009, meeting where it was decided that full-time staffing at the library would be reduced by 2 full-time employees.

[14] This was a change from the September 8, 2009, meeting where it was decided that Engineering Secretary position would be changed from full-time (40 hours per week) to 19 3/4 hours per week.

was for budgetary reasons." <u>See</u> Docket No. 53-12 at page 24 (Hothem Depo. at 165-66).  When asked about the reason for the health insurance increase, Mr. Hothem testified that he did not recall Mr. Pummel saying anything other than that the health costs would be going up. <u>Id.</u>

With regards to the motions made and passed at the September 8 and 14, 2009, city council meetings, the following actions were taken by the city. One full-time library position, held by Barb Schon (age 62) was eliminated.  <u>See</u> Docket No. 86 at ¶ 47.  The Engineering Secretary, Krysti Weed, had her hours reduced from 40 hours per week to 30 hours per week.[15]  <u>Id.</u> at ¶ 48.  The hours of Lucy Ruby, an accounts payable clerk in the finance office, were reduced from 40 hours per week to 35 hours per week.[16]  <u>Id.</u> at ¶ 49.

Although not budgeted for by Ms. Landphere during her 2010 budget, the city paid out approximately $18,000 in unemployment benefits.  <u>See</u> Docket No. 90-52.  The $18,000 paid in unemployment benefits represents the

---

[15] At the December 21, 2009, council meeting, a motion was made to increase the Engineering Secretary's hours from 30 to 35.  <u>See</u> Docket No. 76-3 at page 24.  However, the motion did not pass.  <u>Id.</u>

[16] Plaintiffs assert that Lucy Ruby was a full time employee, claiming that the spreadsheet showing employees' wages posted in 2010 listed her as full-time.  <u>See</u> Docket No. 76-6 at page 4.  The city asserts that this document was prepared in February 2011 at the plaintiffs' request and that Lucy Ruby's full-time employment status was an error.  <u>See</u> Docket No. 86 at ¶ 49 (City's reply). The city asserts that Lucy Ruby was actually a regular part-time employee as was listed in their official publication in January of 2010.  <u>See</u> Docket No. 90-12 at page 2.

amount paid for all persons claiming unemployment.  Id.  The unemployment figure attributable to Mr. Hothem and Mr. Stevens as of July 20, 2010, was $5,567.  Id.

On November 9, 2009, an identical letter was sent to both Mr. Hothem and Mr. Stevens informing them that their positions were "going to be eliminated [as of January 1, 2010] as a reduction in force action for the city of Belle Fourche."  See Docket No. 86 at ¶ 51.  The letter also indicated that the reason for the "action [was] due to budgetary matters."  Id.

Mr. Pummel testified that he and the council were "looking at places...[they] could eliminate that would cause the least pain to the city and to its taxpayers in trying to achieve a very tough budget."  See Docket No. 53-14 at page 6 (Pummel Depo. at 34-35).  The city asserts that it was easier to cut Mr. Hothem's and Mr. Stevens' positions than positions in other departments because custodial/maintenance department was not doing a good job in 2009. See Docket No. 86 at ¶ 52.  Mr. Hothem and Mr. Stevens argue that their department was not performing poorly.  See id. (Plaintiffs' response). Councilmember McElwain testified that Mr. Hothem and Mr. Stevens were not terminated for any performance-related reasons.  See Docket No. 73-6 at page 3 (McElwain Depo. at 26).

The city asserts that even after the September 2009 decision to eliminate Mr. Hothem's and Mr. Stevens' positions there continued to be performance

issues.  See Docket No. 86 at ¶ 53.  As a result, on November 16, 2009, during

an open session of City Council, the City Council decided to terminate

Mr. Hothem and Mr. Stevens immediately, but continue to pay them their

salary and benefits through December 31, 2009.  Id.  The city admits that

Mr. Hothem and Mr. Stevens were not provided any explanation or prior notice

about their termination, nor were they given the opportunity to provide reasons

why the action should not be taken, which Mr. Hothem and Mr. Stevens assert

was in violation of the city's own policies.[17]  See Docket no. 87 at ¶ 86.

Mr. Hothem and Mr. Stevens assert that performance issues within their

department did not continue after Mr. Hothem's meeting with the City Council.

They assert that once the performance improvement plan was put in place

---

[17]  The city's "Disciplinary Action and Grievance Procedure" states,
"[w]hen discipline becomes necessary, it is the responsibility of the Supervisor
to Initiate, administer, and carry through the proper action."  See Docket No.
76-2 at page 17.  The city's disciplinary procedure is stated as follows:
> When an employee is suspended or termination is recommended, the
> following procedures shall be used:
> A.  Notify the employee in writing of the recommended disciplinary
>     action.  The notice shall state the reason(s) for the action,
>     including any prior disciplinary actions and the facts of any other
>     incidents upon which the present disciplinary action is based.  The
>     notice shall also advise the employee of the right to grieve the
>     disciplinary action.
> B.  The Common Council or Department Head shall meet with the
>     employee to give the employee an opportunity to present reasons,
>     verbally or in writing, why the action should not be taken.

Id. at page 18.

during the executive session in the spring of 2009 that there were no further reprimands.  <u>See</u> Docket No. 86 at ¶ 53 (Plaintiffs' response).

Within 12 hours of terminating Mr. Hothem, a recommendation was forwarded to the Public Works Committee, of which Pummel was chair, to hire Kim Smoot, age 53, to "oversee all activities of custodial/maintenance."  <u>See</u> Docket 68, ¶ 89.  The city promoted Mr. Smoot, who previously worked in the public works department as a public works maintenance technician, to the position of custodial/maintenance technician IV/foreman and gave him a raise of more than $3.00 per hour.[18]  <u>Id.</u> at ¶¶ 56-57.  Mr. Smoot's duties included overseeing the activities of custodial maintenance and its employees.  <u>Id.</u> at ¶ 55.  When Mr. Hothem was terminated he was 62 years old and Mr. Smoot was 53 years old.  <u>Id.</u> at ¶ 59.

In August of 2009, Penny Herman, a custodial maintenance technician, resigned.[19]  <u>Id.</u> at ¶ 60.  Dennis Hothem recommended to the council that Jeff Hauf be hired.  <u>Id.</u> at ¶ 61.  However, the city sent a letter to Mr. Hauf

------

[18] Mr. Hothem asserts that Mr. Smoot was a replacement employee. Mr. Hothem was making $14.52 an hour when he was terminated.  <u>See</u> Docket No. 86 at ¶ 58.  Mr. Smoot was promoted to the custodial/maintenance foreman position and given a raise from $12.46 per hour to $14.52 per hour and then also received a 3% cost of living increase on January 1, 2010, bringing his hourly rate to $14.96.  <u>Id.</u> at ¶ 57 (Plaintiff's response and city's reply).

[19] Penny Herman's position prior to her resignation was a part-time position at 19 3/4 hours per week.  <u>See</u> Docket No. 86 at ¶ 60.

indicating that the city was still in the planning stage of the 2010 budget and that the recommendation to hire him had been placed on hold.  Id. at ¶ 62.  On November 19, 2009, three days after Mr. Stevens, a full-time employee, was terminated, the city made a recommendation to hire Mr. Hauf as a part-time (19 3/4 hours) custodial/maintenance technician at a rate of $10.39 per hour. Id. at ¶ 63 (Plaintiffs' response and city's reply).  Mr. Hauf was hired on December 7, 2009, and was 48 years old when hired.  Id. at 65.  In February 2010, Mr. Hoffman requested that Mr. Hauf's hours be increased from 19 3/4 hours per week to 35.  See Docket 77-1 at page 6.  Jeff hauf was reclassified from part-time to regular part-time in April of 2009.  See Docket No. 86 at ¶ 71.

On December 7, 2009, Dirk Hoffman, the public works director, was given a raise from $23.96 per hour to $27.51 per hour, plus his 3% cost of living increase, bringing his total hourly rate to $28.34 per hour.  Id. at ¶¶ 66-67.  The city asserts that Mr. Hoffman was given this raise as part of the city's restructuring the custodial/maintenance department that gave Mr. Hoffman additional administrative duties, including overseeing the custodial/maintenance division.  Id. at ¶¶ 66, 68.  Mr. Hothem and Mr. Stevens assert that Mr. Hoffman did not absorb the administrative duties over the custodial/maintenance department, but that those duties remained with the new head of the custodial/maintenance department, Mr. Smoot.  Id. (Plaintiffs' response).

The city asserts that when Mr. Hothem was the head of the custodial/maintenance department, that he supervised the department, performed administrative duties, and also performed other maintenance/custodial work including mopping, dusting, waxing, setting up for events, and maintaining the HVAC system.  Id. at ¶ 69.  The city asserts that when Mr. Smoot took the foreman position in custodial/maintenance that he assumed a number of the duties previously performed by Mr. Hothem, but that he also did many other job that Mr. Hothem never performed, including snow removal, operating heavy equipment, reroofing, carpentry work, taping and texturing walls, tile and grout work, concrete work, building fences, and installing windows.  Id. at ¶ 70.  The city asserts that it got "more bang for its buck with Kim Smoot than it got from Mr. Hothem."  See Docket No. 54 at page 19.  While Mr. Hothem agrees that Mr. Smoot took over his duties, he asserts that Mr. Smoot's job description did not require Mr. Smoot to perform these other job functions and that, other than roofing, he was able to and did the same items the city asserts that Mr. Smoot could do.  See Docket no. 67-1 at pages 18-19.

Mr. Hothem and Mr. Stevens, as a result of their terminations, commenced this suit alleging that they were terminated as a result of age discrimination or, in the alternative, because they spoke out against removing the asbestos tiles.  See Docket No. 1.

23

## DISCUSSION

**A.    Summary Judgment Standard**

Under Rule 56(c) of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the movant can "show that there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law."  In determining whether summary judgment should issue, the court views the facts, and inferences from those facts, in the light most favorable to the nonmoving party.  See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).

Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); FED. R. CIV. P. 56(e)(each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).  In determining whether a genuine issue of material fact exists, the court views the evidence presented in light of which party has the burden of proof under the underlying substantive law.  Id.  Summary judgment will not lie if

there is a genuine dispute as to a material fact, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

The substantive law identifies which facts are "material" for purposes of a motion for summary judgment.  Anderson, 477 U.S. at 247.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248 (citing 10A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2725, pp. 93-95 (1983)).  The Supreme Court has further explained that:

> the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved *conclusively* in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.

Anderson, 477 U.S. at 248-49 (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-89 (1968)(emphasis added)).  Essentially, the availability of summary judgment turns on whether a proper jury question is presented.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson, 477 U.S. at 250.

25

With regards to discrimination claims, the Eight Circuit recently noted, *en banc*, that notwithstanding statements in prior decisions that summary judgment should be seldom used in discrimination cases, summary judgment is not disfavored and is designed for "every action."  See Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011).  Furthermore, the court noted that "[t]here is no 'discrimination case exception' to the application of summary judgement, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial."  Id. (citing Fercello v. County of Ramsey, 612 F.3d 1069, 1077 (8th Cir. 2010)).

**B.     The City of Belle Fourche's Motion for Summary Judgment**

**1.     Age Discrimination in Employment Act**

The Age Discrimination in Employment Act ("ADEA") prohibits employers from taking adverse employment actions against employees because of their age.  29 U.S.C. § 623(a)(1).  The ADEA's purpose is "to promote employment of older persons based on their ability rather than age" and "to prohibit arbitrary age discrimination in employment."  29 U.S.C. § 621(b).  The ADEA provides protection to "individuals who are at least 40 years of age."  29 U.S.C. § 631(a).  Age discrimination can take two forms: disparate treatment (i.e. purposeful discrimination) and disparate impact.  Purposeful discrimination may be shown by offering either direct evidence or indirect evidence of age

26

discrimination under the McDonnell Douglas[20] burden-shifting analysis.  See
King v. United States, 553 F.3d 1156, 1161 (8th Cir. 2009).

### a.  Direct Evidence of ADEA Discrimination

Direct evidence "refers to the causal strength of the proof."  Richardson v.
Sugg, 448 F.3d 1043, 1058 (8th Cir. 2006).  The evidence "must be strong
enough to show a specific link between the [alleged] discriminatory animus and
the challenged decision, sufficient to support a finding by a reasonable fact
finder that an illegitimate criterion actually motivated the employment
decision."  Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P., 444 F.3d
961, 965 (8th Cir. 2006) (citations omitted).  Direct evidence must support an
inference that a discriminatory attitude was more likely than not the
motivating factor in the decision.  Id.

"Direct evidence usually includes conduct or statements by persons with
decision making responsibilities that can be viewed as directly reflecting the
employer's discriminatory attitude."  Jelsma v. City of Sioux Falls, 744
F. Supp. 2d 997, 1012 (D.S.D. 2010) (citing Schierhoff, 444 F.3d at 966).
Direct evidence does not include "stray remarks in the workplace, statements
by nondecisionmakers, or statements by decisionmakers unrelated to the
decisional process."  Radabaugh v. Zip Feed Mills, Inc., 997 F.2d 444, 449 (8th

---

[20] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Cir. 1993).  Examples of direct evidence usually include statements connected to the employee's age and the job duties.  <u>See, e.g.</u>, <u>E.E.O.C. v. Liberal R-II Sch. Dist.</u>, 314 F3d 920, 924-25 (8th Cir. 2002) (finding direct evidence of discrimination when a supervisor told a bus driver that he "was too old to drive a bus"); <u>Kneibert v. Thompson Newspapers, Mich., Inc.</u>, 129 F.3d 444, 452 (8th Cir. 1997) (finding that a decisionmaker's statement to a terminated editor that he "had no use for a senior editor" and instead needed "three young editors" was direct evidence of ADEA discrimination).

Mr. Hothem and Mr. Stevens argue that Mr. Pummel and other council members had a plan to "get rid of them" because of their age.  <u>See</u> Docket No. 67-1 at page 17.  To support this arguments, Mr. Hothem and Mr. Stevens highlight e-mails between Mr. Pummel and Gloria Landphere, and other documents related to the increasing costs of health care.  <u>Id.</u>  Specifically, they assert that the following facts amount to direct evidence of discrimination: (1) the council's expression of concern over rising health care costs and a quote provided by Kellie Pummel, the city's insurance agent, that had highlighted the costs of insurance and the age brackets 55-64; (2) an e-mail sent from Ms. Landphere to Mr. Pummel indicating that she had gone through the health insurance documents person-by-person for each employee;  (3) the fact that the ages of Mr. Hothem and Mr. Stevens could not have escaped Mr. Pummel's notice; and (4) that there was "no discussion about ways to keep older

28

employees on board and still reduce costs, but [Mr.] Pummel and other members of the council began directing their efforts to get rid of them." Id.

Mr. Hothem and Mr. Stevens never allege that Mr. Pummel or any other council member made a statement directly connected to age.  In fact, they "concede that they do no have any remarks where a City Council member or the mayor specifically referred to their ages." Id. at page 16.

"[F]actors other than age, but which may be correlative with age, do not implicate the prohibited stereotype, and are thus not prohibited considerations" in an employment decision.  Schiltz v. Burlington N. R.R., 115 F.3d 1407, 1412 (8th Cir. 1997).  While mentioning the rising cost of health care and going through each individual employee's health insurance documents may, in some form or fashion, be correlative with age, that does not prove that Mr. Hothem's and Mr. Steven's supervisors discriminated against them because of their age.

The Eighth Circuit has held that "[e]mployment decisions motivated by characteristics other than age such as salary and pension benefits, even when such characteristics correlate with age, do not constitute age discrimination." Hanebrink v. Brown Shoe Co., 110 F.3d 644, 647 (8th Cir. 1997).  In Hanebrink, the court held that although the plaintiff speculated that his salary, retirement benefits, or health benefits played a role in his discharge, that he

29

produced no evidence tending to demonstrate that these benefits were used as proxies for his age.  Id.

In this case, Mr. Pummel's e-mails and other health-care-related documents, or the inferences Mr. Hothem and Mr. Stevens have attempted to draw from them, do not amount to direct evidence of a discriminatory motive. See Underwood v. Monroe Mfg., LLC, 434 F. Supp. 2d 680, 688-89 (S.D. Iowa 2009) (owner's statement to sales manager that group health insurance costs were higher because the plant employed "some" or "a lot" of "old, sick people" and inquiries of a production supervisor as to his retirement plans were not direct evidence of age discrimination); Cox v. Infomax Office Sys., Inc., 2009 WL 124700, *7 (S.D. Iowa 2009) ("comments regarding the rising cost of healthcare due to the age of employees does not evince a discriminatory motive").  Based on the record in this case, the court finds that there is no direct evidence which would support a jury finding that the city's decision to eliminate the positions of Mr. Hothem and Mr. Stevens was based on their age.

### b.    Indirect Evidence of ADEA Discrimination

An employee may also prove discrimination based on inferences and circumstantial evidence under the McDonnell Douglas burden-shifting analysis, which applies to ADEA claims.  Richmond v. Bd. of Regents of Univ. of Minn., 957 F.2d 595, 598 (8th Cir. 1992).  Under this analysis, an employee can establish a *prima facie* case of age discrimination by proving that the

30

employee (1) was at least 40 years old; (2) suffered adverse employment actions; (3) was qualified for his job or that he was meeting the employer's reasonable expectations at the time of the adverse actions; and (4) was replaced by someone substantially younger.[21]  Lewis v. St. Cloud State. Univ., 467 F.3d 1133, 1137 (8th Cir. 2006).  If the employee makes the requisite *prime facie* showing, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment actions.  Schiltz, 115 F.3d at 1414.  If the employer meets that showing, then the burden shifts back to the employee to show that the employer's reason is mere pretext.  Id.

The city admits that Mr. Hothem and Mr. Stevens satisfy the first two elements of the *prima facie* case.  See Docket No. 54 at page 17.  However, the parties dispute whether the third and fourth elements of the *prima facie* case are met.

> **i.   Whether Mr. Hothem and Mr. Stevens were qualified for their jobs or were meeting the city's reasonable expectations at the time of their termination**

The third element, as cited by both parties, requires Mr. Hothem and Mr. Stevens to establish that they were qualified for their jobs or were meeting

---

[21] In a reduction-in-force analysis, under the fourth prong, the plaintiff must "come forward with additional evidence that age was a factor in his termination in order to establish a *prima facie* case."  Holley v. Sanyo Mfg., 771 F.2d 1161, 1165-66 (8th Cir. 1985).

their employer's reasonable expectations at the time of the adverse action or termination. <u>See</u> Docket Nos. 54, 67-1. The parties do not agree on the proper analysis of this third element. The city asserts that this third element requires only an analysis of whether Mr. Hothem and Mr. Stevens were performing at the level that met the city's legitimate expectations. <u>See</u> Docket No. 54 at pages 17-18. Mr. Hothem and Mr. Stevens argue that the third element only requires them to show that they were qualified for their respective jobs at the time they were hired. <u>See</u> Docket No. 67-1 at page 12.

In <u>Haigh v. Gelita USA, Inc.</u>, 632 F.3d 464, 469-70 (8th Cir. 2011), the Eighth Circuit noted, with regards to this prong of the *prima facie* case that "there appears to be somewhat conflicting case law in the circuit." The court noted that in some Eighth Circuit cases, the court has concluded that "a plaintiff could not meet her *prima facie* case of age discrimination where she failed to meet the qualification prong based on deficiencies in her work performance." <u>Id.</u> at 469 (citing <u>Erenberg v. Methodist Hosp.</u>, 357 F.3d 787, 793 (8th Cir. 2004)). However, in later cases, the <u>Haigh</u> court cited cases holding that "a plaintiff must show only that he possesses the basic skills necessary for performance on the job, not that he was doing it satisfactorily." <u>Id.</u> (citing <u>McGinnis v. Union Pacific R.R.</u>, 496 F.3d 868, 874 n.2 (2007)).

While the <u>Haigh</u> court did not resolve the conflict, it did indicate that it was "of the view that the reasoning in <u>McGinnis</u> is more sound under the

burden-shifting framework because the plaintiff should not be required to anticipate and disprove his employer's reasons for termination during his *prima facie* case." Id. at 470; see also McGinnis, 496 F.3d at 875 (holding that a requirement that a plaintiff prove he was performing at the city's legitimate expectations, "in a sense, required [the plaintiff] to disprove the reasons for his discharge rather than requiring him to establish a *prima facie* case–short-circuiting the analysis under McDonnell Douglas framework."); Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 92 (2d Cir. 2001) ("The qualification prong must not...be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in his *prima facie* case, the employer's proffer of a legitimate, non-discriminatory basis for its decision.").

Based on the foregoing authorities, this court finds that the appropriate analysis under the third element of the prima facie case is not whether Mr. Hothem and Mr. Stevens were performing their jobs to the city's satisfaction. If this were the analysis, it would require Mr. Hothem and Mr. Stevens to disprove the reasons for their discharge rather than requiring them to establish the *prima facie* case. Rather, the appropriate analysis under the third element of the McDonnell Douglas analysis is whether Mr. Hothem and Mr. Stevens were qualified to perform their respective jobs. See Haigh, 632 F.3d at 469-70; Riley v. Lance, 518 F.3d 996, 1000-01 (8th Cir. 2008). There is no indication, and the city offers none, showing that Mr. Hothem and

Mr. Stevens were not qualified for their respective jobs. In fact, the city itself sought Mr. Hothem out when they hired him, convincing him to leave another job for employment with the city. See Docket No. 68 at ¶ 2. Therefore, this court finds that the third element of the *prima facie* case has been established.

### ii.    Whether Mr. Hothem and Mr. Stevens were replaced by someone substantially younger

The parties also disagree as to whether Mr. Hothem and Mr. Stevens can establish the fourth element of the *prima facie* case. The fourth element requires a showing that Mr. Hothem and Mr. Stevens were replaced by individuals who were substantially younger. Plaintiffs assert that Mr. Hothem was replaced by Kim Smoot, who was 9 years younger, and that Mr. Stevens was replaced by Jeff Hauf, who was 13 years younger. See Docket No. 67-1 at page 15. The city argues that Mr. Hothem and Mr. Stevens were not replaced by Kim Smoot and Jeff Hauf, respectively. See Docket No. 54 at page 17-19.

The city directs this court to several cases in the Sixth Circuit where it has been held that a "person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." Barnes v. Jen Corp., Inc., 896 F.2d 1457, 1465 (6th Cir. 1990) (citations omitted); see also Lilley v. BTM

Corp., 958 F.2d 746, 752 (6th Cir. 1992) ("spreading the former duties of a terminated employee among the remaining employees does not constitute replacement.").  However, the controlling law for this court is Eighth Circuit case law.

The Eighth Circuit dealt with this issue in Cova v. Coca-Cola Bottling Co. of St. Louis, Inc., 574 F.2d 958 (8th Cir. 1978).  In Cova, one of the plaintiffs, a secretary to a manger, claimed that she was replaced after she was terminated. Id. at 961.  The court held that it was clear that Coca-Cola did not replace the plaintiff because, although "a new receptionist occupied her desk...many of [the plaintiff's] duties were parceled out to other employees."  Id.; see also Reddemann v. Minnesota Higher Educ. Coordinating Bd., 811 F.2d 1208, 1209 (8th Cir. 1987) (finding no clear error in district court's conclusion that plaintiff "was not replaced after his departure, but rather that his responsibilities were merely distributed to other employees").

In Christensen v. Titan Distribution, Inc., 481 F.3d 1085 (8th Cir. 2007), a younger worker was hired to perform the duties of the plaintiff, a third-shift supervisor, while the plaintiff was out on short-term disability leave.  Id. at 1090.  When the plaintiff's leave was finished, his employer refused to rehire him.  Id. 1090-91.[22]  The younger worker continued to perform the plaintiff's

---

[22]The Christensen case is a failure-to-hire case rather than a discriminatory-firing case because Christensen originally worked for a

job duties, but was not given the title of third-shift supervisor until a year after the plaintiff's employment was terminated.  Id. at 1090.  The employer argued that it had a legitimate, nondiscriminatory reason for not rehiring the plaintiff: it asserted that it had eliminated the third-shift supervisor position for economic reasons.  Id. at 1096.  The Eighth Circuit held that, on these facts, a reasonable jury could have found that the employer's proffered reason was a mere pretext for purposeful discrimination.  Id.

In Jelsma v. City of Sioux Falls, 744 F. Supp. 2d 997 (D.S.D. 2010), the district court denied defendant's motion for summary judgment where, after the plaintiff's employment was terminated, a substantially younger worker absorbed the plaintiff's duties, even though the younger worker did not receive the plaintiff's job title.  Id. at 1013-14.

In Christensen, the record made clear that the job duties performed by the younger replacement employee were the same as the plaintiff had previously performed, although the job titles of the two men were not the same.  See Christensen, 481 F.3d at 1096 n.5.  In Jelsma, too, the duties of the

---

subcontractor who provided services to the employer.  While Christensen was out on disability leave, the employer terminated the subcontract and hired most all of the subcontractor's employees to work for the employer directly.  Christensen had applied to the employer while he was on disability, and the employer declined to hire him.  See Christensen, 481 F.3d at 1090-91.

plaintiff and his younger replacement were the same, although the job titles were not.  <u>Jelsma</u>, 744 F. Supp. 2d at 1013-1014.

The city, in support of its argument, asserts that after discharging Mr. Hothem, his duties were assigned to the existing public works director, Dirk Hoffman, and another employee, Kim Smoot.  <u>Id.</u>  As further evidence that Kim Smoot did not replace Mr. Hothem, the city argues that Kim Smoot was not reassigned to the custodial/maintenance section of the public works department to perform exclusively the duties of Mr. Hothem.  <u>Id.</u>  Rather, the city asserts that Kim Smoot "does work of significant value to the city that Mr. Hothem never performed" including "plowing snow, operating heavy equipment, reroofing buildings, performing significant carpentry work, pouring and finishing concrete, building fences, and installing windows."  <u>Id.</u>

The city also points to various differences in the job descriptions between Mr. Hothem's position and Kim Smoot's position, including: (1) Mr. Hothem was under the general supervision of the mayor and reported to the legal/finance committee, whereas, Mr. Smoot was under the general supervision of the public works director; (2) Mr. Hothem's job entailed administrative duties such as conducting education training programs, obtaining bids, approving financial expenditures, analyzing the budget and making recommendations regarding the budget, whereas Mr. Smoot's job

description contained no administrative duties;[23] (3) Mr. Hothem's supervisory duties including making recommendations regarding new policies and procedures, maintaining final responsibility regarding upkeep and maintenance of all city buildings, and reviewing the quality of finished products to ensure they conformed with blueprints, specs, and standards, whereas Mr. Smoot's job description did not contain these responsibilities; and (4) Mr. Hothem's job description required technical experience and knowledge of plant management with five years experience in plant management, whereas Mr. Smoot's position did not.  See Docket No. 91 at pages 12-13.

In this case, it is clear that Mr. Smoot assumed almost all of Mr. Hothem's job-related duties.  After Mr. Hothem was terminated, Mr. Smoot

---

[23] The city contends that the administrative duties were reassigned to Dirk Hoffman, the Public Works Director, when the custodial/maintenance department was restructured under the public works department.  Mr. Hothem disputes this fact and asserts that the administrative duties remained with Mr. Smoot.  In support of his argument, Mr. Hothem points out that his former administrative duties do not appear in the job description of the Public Works Director (Mr. Hoffman) after the city fired Mr. Hothem.  See Docket No. 86 at ¶ 68 (Plaintiffs' response).  Following the restructuring of the custodial/maintenance department, the Public Works Director's job description was changed to include supervision of the custodial/maintenance departments.  See Docket No. 76-4 at pages 5-7.  The job description for the Public Works Director states that the "essential duties and responsibilities" of the Public Works Director include developing and administering the annual budget, performing record keeping and bookkeeping functions, coordinating the purchase of inventory or equipment and supplies as needed, and coordinating the safety training for *all* covered departments.  See Docket No. 76-4 at page 5.

was rather immediately promoted to the custodial/maintenance foreman position for the public works department and performed many of the same duties as Mr. Hothem, including overseeing the custodial/maintenance division.  The city contends that Mr. Smoot also performed other various duties that Mr. Hothem did not perform, including snow removal, roofing, and concrete work.[24]  However, other than roofing, Mr. Hothem asserts that he was able to, and did the same tasks that the city alleges Mr. Smoot could do.  See Docket No. 67-1 at pages 18-19.  Furthermore, these additional tasks which the city relies upon to distinguish Mr. Smoot's job from Mr. Hothem's job do not appear in Smoot's job description.

Absent the administrative duties that Mr. Hothem performed, the duties of Mr. Smoot are very similar to those of Mr. Hothem's position.  Compare Docket No. 90-57 (Custodial/Maintenance Technician IV/Foreman job description) with Docket No. 90-61 (Maintenance & Custodial Working Supervisor job description).  The administrative duties do not specifically appear in the job descriptions for either Mr. Smoot or Mr. Hoffman, the Public Works Director.   There is a factual issue about who in fact assumed the administrative duties of Mr. Hothem, but it is clear that, following

---

[24] It is unclear from the record whether Mr. Smoot was performing these various other duties prior to this promotion as the custodial/maintenance foreman or whether these duties were assigned to him as part of his new position.

Mr. Hothem's termination, Mr. Smoot was promoted, given a raise reflective of his new position, and assumed almost all other responsibilities previously held by Mr. Hothem.

The city argues that even if Mr. Smoot was a replacement for Mr. Hothem, that the nine-year age gap is not, "as a matter of law," a substantial age difference.  See Docket No. 54 at page 20.  In support of this argument, the city cites Girten v. McRentals, Inc., 337 F.3d 979, 982 (8th Cir. 2003), where the court voiced doubt whether a nine-year age difference is "sufficient to infer age discrimination."   Although the court in Girten voiced doubt about the nine-year age difference, the court also assumed in that case that the *prima facie* case for age discrimination had been established.  Id. While this court does not disregard the Girten court's discussion regarding the nine-year age difference, Girten did not establish a bright-line rule that nine years was an insufficient gap--as the city asserts.

Viewing the facts in the light most favorable to Mr. Hothem, this court cannot say that there is no genuine issue of fact as to whether Mr. Smoot replaced Mr. Hothem.  A material issue of fact exists as to whether the city replaced Mr. Hothem with Mr. Smoot, even though Mr. Smoot held a different job title and had fewer administrative duties.

As to Mr. Stevens, it is claimed that the city replaced him with Jeff Hauf. In support of this argument, Mr. Stevens asserts that Mr. Hauf was hired and

identified by the city to replace Mr. Stevens within three days of the November 16, 2009, City Council meeting, in which Mr. Stevens was terminated.  <u>See</u> Docket No. 67-1 at page 7.  Mr. Stevens argues that although Mr. Hauf was hired as a part-time employee he was paid $10.39 per hour, nearly the same hourly rate, $11.07, as Mr. Stevens who had been with the city for two years.  <u>Id.</u>

The city admits that Mr. Hauf was a replacement employee, but argues that he was not hired as a replacement for Mr. Stevens.  <u>See</u> Docket No. 87 at ¶ 96.  The city argues that Mr. Hauf was actually hired on December 7, 2009, for 19 3/4 hours per week, which did not include any benefits; that it was not until February 2010 that a request was made to increase his hours to 35 hours per week; and that it was not until April 4, 2010, that Mr. Hauf was reclassified from a part-time employee to a regular part-time employee.  <u>See</u> Docket No. 91 at page 13, 53-9 at page 3.  The city also points to various difference between the job descriptions of Mr. Stevens and Mr. Hauf including that: (1) Mr. Stevens was a full-time employee and assistant supervisor, whereas Mr. Hauf was a part-time and then regular part-time employee and did not supervise any employees (2) Mr. Stevens assisted Mr. Hothem with administrative duties, including work on the budget, whereas Mr. Hauf had no administrative duties; and (3) Mr. Stevens was in charge of the department in the absence of

Mr. Hothem, whereas Mr. Hauf had no supervisory duties. <u>See</u> Docket No. 91 at page 13.

It is clear that Mr. Hauf performed many of the same duties that Mr. Stevens performed. The city acknowledges that other than the few administrative duties Mr. Stevens assisted Mr. Hothem with that Mr. Stevens did the same custodial work the custodial/maintenance technicians did. <u>See</u> Docket No. 86 at ¶ 11. While the city admits that Mr. Hauf was a replacement employee, they dispute that he actually replaced Mr. Stevens. <u>See id.</u> (City's reply). However, the city never sets forth who they believe Mr. Hauf actually replaced. Additionally, there is no evidence indicating that Mr. Stevens' duties were simply parceled out or redistributed among other employees. Although Mr. Hauf had no supervisory duties, there is an issue of material fact as to whether Mr. Hauf actually replaced Mr. Stevens.[25] As to the requirement that

---

[25] In August of 2009, Penny Herman, a custodial maintenance technician, resigned. <u>See</u> Docket No. 86 at ¶ 60. After Ms. Herman's resignation, the city posted and advertised for a part-time position at 19 3/4 hours per week. <u>Id.</u> On or about September 3, 2009, Mr. Hothem interviewed Jeff Hauf for this position and recommended to the council that Mr. Hauf be hired. <u>Id.</u> at ¶ 61. However, on September 10, 2009, Mr. Hauf was sent a letter indicating that the city was putting the recommendation on hold. <u>Id.</u> at ¶ 62. Mr. Stevens was terminated on November 16, 2009, and on November 19, 2009, and e-mail was sent recommending Mr. Hauf be hired, which recommendation was approved on December 7, 2009. <u>See</u> Docket No. 77-3 at pages 4-6. Thus, it is unclear from the record whether Mr. Hauf was hired as a replacement for Ms. Herman, Mr. Stevens, or somebody else. This creates a genuine issue of material fact as it goes directly to Mr. Stevens' *prima facie* case.

the replacement be substantially younger, Mr. Hauf is 13 years younger than Mr. Stevens.

Although Mr. Hothem and Mr. Stevens assert that the elimination of their positions did not take place as a result of a reduction-in-force, the city asserts that Mr. Hothem and Mr. Stevens are unable to satisfy the additional requirement of coming forward with additional evidence that age was a factor in their terminations.

In Holley, the Eighth Circuit discussed this additional requirement which a plaintiff must show during a *prima facie* case when the discrimination claim is based on a reduction-in-force. See Holley, 771 F.2d at 1165-66. In Holley, Holley claimed that he was replaced by a younger employee. Id. at 1167. However, the court noted that "the fact alone that Holley's duties were assumed by a younger person-the fact of an age differential-itself is insufficient additional evidence to establish a *prima facie* case." Id. Additionally, the court stated that the younger employee "did not simply take Holley's place but, rather, that the duties of Holley's position and that of the younger person's position were consolidated pursuant to the plan necessitated by the reduction-in-force." Id. Therefore, the court held that Holley would have been required to show that he would have been denied the consolidated position despite his greater expertise and larger salary. Id. However, Holley offered no evidence as to the younger person's salary nor of his greater qualification for the

43

consolidated position.  Id.  Rather, Holley claimed that his termination allowed his employer to find a replacement employee and pay him a smaller salary than Holley's.  Id. at 1167-68.  The court held that this sole assertion was not sufficient "additional evidence" that age was a factor in his termination.  Id. at 1168.  Therefore, the court held that Holley failed to satisfy the additional requirement under the *prima facie* case.  Id.

In this case, although the city asserts there was a reduction-in-force, the record indicates that the positions were not in fact eliminated or consolidated as they were in Holley.[26]  Rather, Mr. Smoot's and Mr. Hauf's new positions were very similar to Mr. Hothem's and Mr. Stevens' positions.  Additionally, assuming that a jury could find that positions were consolidated, the City never offered Mr. Hothem and Mr. Stevens the opportunity to apply for these "new" positions, for which they were obviously qualified since the duties under the "new" positions were the same duties previously performed by Mr. Hothem and Mr. Stevens.  No offer was made to Mr. Hothem to continue performing as the supervisor for the custodial/maintenance department minus some administrative duties.  Additionally, no offer was made to Mr. Stevens to

---

[26] Some of the administrative duties previously performed by Mr. Hothem appear to have been consolidated and included among the duties of the public works director.  However, by in large, the majority of Mr. Smoot's duties as the foreman of the custodial/maintenance department are identical to those performed by Mr. Hothem.

continue as a custodial/maintenance technician with reduced hours and benefits.  Rather, it appears that the city terminated Mr. Hothem and Mr. Stevens and then promoted and hired new individuals to fill very similar roles at equivalent or nearly equivalent salaries.

Where it appears the city may have saved some money is in the costs associated with healthcare benefits for both plaintiffs.  The record is clear that the city was concerned with the rising costs of healthcare for its employees.  As a result the city requested documentation regarding the health care costs of each employee.  The costs for those employees who fell within the 55-64 age bracket were highlighted and clearly indicate the additional expense of providing insurance for those individuals.  See Docket No. 78-2 at page 16. Furthermore, Mr. Hothem and Mr. Stevens point out that the only individuals whose positions were terminated or had their hours reduced were all older than 55.  Viewing these factors in the light most favorable to Mr. Hothem and Mr. Stevens, these facts are additional evidence that age was at least a factor in the city's decision to terminate Mr. Hothem and Mr. Stevens.

### iii.   Whether the city had a legitimate nondiscriminatory reason for terminating Mr. Hothem and Mr. Stevens

If Mr. Hothem and Mr. Stevens established their *prima facie* case, the burden would shift to the city to articulate a legitimate, nondiscriminatory reason for the adverse employment actions.  Schiltz, 115 F.3d at 1414.  The

45

city argues that a nondiscriminatory reason existed for its actions and that age was not a factor when eliminating positions.  The city asserts that it was in the midst of an economic downturn and that consequently it directed all departments to cut 5% of their existing 2009 budgets.  See Docket No. 86 at ¶ 32.  Furthermore, the city asserts that as part of the decision-making process on the 2010 budget, it was clear that the city was facing a substantial shortfall in revenues.  See Docket No. 54 at page 22.  At that point, the city asserts that it had "no choice but to make cuts in the budget."  Id.  Under the "comprehensive budgetary plan voted on by the council, the council eliminated positions in the library and in custodial/maintenance; reduced hours of employees in the finance office and the engineering office; and voted to reduce dispatch costs and the city's share of premiums for employee health insurance."  Id.   The city's proffered reasons for the elimination of Mr. Hothem's and Mr. Stevens' positions are legitimate and nondiscriminatory.

### iv.    Whether the city's proffered reasons are mere pretext

The burden now shifts back to Mr. Hothem and Mr. Stevens to show that the city's proffered reasons for eliminating their positions was mere pretext. "[T]he showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee.  A plaintiff must also demonstrate that the circumstances permit

46

a reasonable inference of discriminatory animus." Haigh, 632 F.3d at 470.

Mr. Hothem and Mr. Stevens "can avoid summary judgment only if the evidence considered in its entirety (1) creates a fact issue as to whether [the city's] proffered reasons are pretextual and (2) creates a reasonable inference that age was a determinative factor in the adverse employment decision." Thomas v. Corwin, 483 F.3d 516, 529 (8th Cir. 2007).

In determining whether the city's reasons were the actual reasons for the elimination of Mr. Hothem's and Mr. Stevens' positions, the city is entitled to the benefit of the business judgment rule. Walker v. AT&T Tech., 995 F.2d 846, 849 (8th Cir. 1993). Under that rule, an employer has the right to make bad or inefficient business decisions as long as those decisions do not involve intentional age discrimination. See Haigh, 632 F.3d at 470-71 (noting that the court "may not second-guess an employer's personnel decisions," and emphasizing "that employers are free to make their own business decisions, even inefficient ones, so long as they do not discriminate unlawfully"); Hanebrink, 110 F.3d at 646 ("This court, moreover, may not second-guess an employer's personnel decisions, and we emphasize that employers are free to make their own business decisions, even inefficient ones, so long as they do not discriminate unlawfully."); Rademaker v. Nebraska, 906 F.2d 1309, 1312-13 (8th Cir. 1990) (holding that it is "undeniably true that the ADEA does not empower courts to choose which business strategies should be implemented or

47

which employees hired or fired", but that "deference to business judgment, however, stops short of permitting age discrimination").

Initially, the court notes that the city hired both Mr. Hothem and Mr. Stevens when they were well over the age of 40.  The Eighth Circuit has noted that "it is unlikely a supervisor would hire an older employee and then discriminate on the basis of age, and such evidence creates a presumption against discrimination."  Haigh, 632 F.3d at 470.  However, an employer's age-related largesse when finances are ample does not conclusively preclude the possibility of later discrimination on the basis of age when finances are constrained.

Mr. Hothem and Mr. Stevens argue that the city's proffered reason for cutting their positions were illusory.  They assert that although the city claims a reduction in force, in reality, there was no reduction in the custodial/maintenance department because the city replaced them almost immediately with two younger individuals at nearly identical salaries.  See Docket No. 67-1 at page 10.  Several questions arise regarding the city's assertion that Mr. Hothem and Mr. Stevens were terminated as part of a necessary reduction-in-force.  In spite of the city's purported need to downsize in order to meet the comprehensive budget plan, Kim Smoot was almost immediately promoted to foreman of the custodial/maintenance department, given a raise, and assumed the majority of Mr. Hothem's duties very shortly

after Mr. Hothem was terminated.  The city did not offer Mr. Hothem the opportunity to fill this position at the wage offered to Mr. Smoot.  Additionally, the Public Works Director, Mr. Hoffman, was given a fairly substantial raise after Mr. Hothem was terminated because, the city asserts, he was assigned additional administrative duties.  It is hard to see where any cost savings were realized by the city.

Furthermore, the city approved Mr. Hauf to be hired as a custodial/maintenance technician just three days after Mr. Stevens was terminated and paid him, a new employee, nearly the same hourly wage Mr. Stevens was paid after two years of employment.  True, some cost savings were realized initially because Mr. Stevens worked only 19 3/4 hours per week, although this was quickly raised to 35 hours a week, reducing any cost savings.  Again, as with Mr. Hothem, the city's assertion that it was experiencing a revenue shortfall is undermined by the fact that raises were given, new individuals were hired shortly after Mr. Hothem and Mr. Stevens were terminated, and new hires were paid salaries nearly equivalent to an employee with two years experience.  This tends to suggest that perhaps some other motive-beyond the city's finances- motivated Mr. Hothem's and Mr. Stevens' terminations.  These facts, when viewed in light most favorable to Mr. Hothem and Mr. Stevens tend to refute the city's proffered reason for Mr. Hothem's and Mr. Stevens' discharge.  See Oxman v. WLS-TV, 846 F.2d

49

448, 453 (7th Cir. 1988) ("Unlike the typical discharge case, an employer who terminates employees pursuant to a [reduction-in-force] rarely replaces the employees it let go.").

Mr. Hothem and Mr. Stevens also assert that the city's proffered reason for their termination have changed over time, undermining the credibility of each of those reasons.  For example, in its response to the plaintiffs' EEOC charge of discrimination, the city cited its cost-saving measures and the inefficiencies of the custodial/maintenance department as the reason for Mr. Hothem's and Mr. Stevens' termination and that there was "no vacancy for a department head or an assistant department head that Dennis Hothem and Kendell Stevens could fill."  See Docket No. 74-5 at pages 2-3.  Although the city asserts that there were no vacancies for Mr. Hothem and Mr. Stevens to fill, it is clear that after terminating Mr. Hothem and Mr. Stevens, the city promoted Mr. Smoot and hired Mr. Hauf for positions that are very similar to those held by Mr. Hothem and Mr. Stevens.  Although qualified for these positions, the city never offered Mr. Hothem and Mr. Stevens the opportunity to apply for the positions.

The city then changed its proffered reason for the terminations after the litigation began, asserting that Mr. Hothem's and Mr. Stevens' positions were terminated because of performance-related issues.  See Docket No. 53-14 at page 6 (Pummel Depo. at 35-36).  However, the city council members do not all

50

agree that performance was a factor in the city's decision to terminate

Mr. Hothem and Mr. Stevens.  At least one council member, Ms. McElwain,

testified that Mr. Hothem and Mr. Stevens were not terminated for any

performance-related reasons.  See Docket No. 73-6 at page 3  (McElwain Depo.

at 26).

Finally, the city asserts in its brief in support of its motion for summary

judgment that it got "more bang for its buck with Kim Smoot than it got from

Mr. Hothem."  See Docket No. 54 at page 19.  These varying explanations and

the apparent disagreement between the council members as to the actual

reason for termination raises a genuine issue of material fact with regard to the

veracity of the city's proffered nondiscriminatory reason.

Finally, Mr. Hothem and Mr. Stevens also point to the fact that the city

was concerned with the rising cost of health care for employees.  They assert

that because of this concern, the city requested and was provided with

documentation regarding the health care costs of each employee.  The costs for

those employees who fell within the 55-64 age bracket were highlighted.

Mr. Hothem and Mr. Stevens argue that it is no coincidence that the only

individuals whose positions were terminated or had their hours reduced were

all older than 55.[27]  The highlighted age categories in the health care cost

---

[27]  In addition to Mr. Hothem and Mr. Stevens, Barb Schon, a librarian, whose position was also eliminated was over the age of 55. See Docket No. 68

document, together with the fact that all of the employees whose positions were eliminated or whose hours were reduced were all older than 55 smacks of age discrimination.

Mr. Hothem and Mr. Stevens also argue that the allegations that their "performance was inadequate was created to justify the decision to terminate these older employees and replace them with younger ones." Id. As evidence of this, Mr. Hothem and Mr. Stevens point out that Mr. Pummel "did not follow city policies in addressing the supposed performance issues." Id. This assertion is related to the May 2009 meeting that Mr. Pummel and others had with Mr. Hothem regarding improving certain aspects of the custodial/maintenance department. Mr. Hothem claims that no follow-up meeting was ever held and that the issues had been resolved, but that the city claimed otherwise in order to justify their termination of Mr. Hothem and Mr. Stevens. Mr. Hothem and Mr. Stevens also assert, and the city admits, that younger department heads, such as Tom Maunders, Chief of Police (age 51 in 2009), and Terry Wolterstorff, City Engineer (age 41 in 2009), both had

---

at ¶ 58.  The city argues that "there is no evidence as to who highlighted portion of the document or when portion of the document were highlighted." See Docket No. 87 at ¶ 48 (City's reply).  However, when viewed in light most favorable to the plaintiffs, this creates a issue of material fact as to the city's motivation for eliminating Mr. Hothem's and Mr. Stevens' positions.

performance-related problems, but that neither were selected for termination at the time Mr. Hothem and Mr. Stevens were.  See Docket No. 87 at ¶ 45.

Viewing these facts in light most favorable to Mr. Hothem and Mr. Stevens, a genuine issue of material fact exists as to whether the city's explanation for its actions were a pretext for age discrimination.  More specifically, there is a genuine issue of material fact as to whether the city's proffered reason for eliminating Mr. Hothem and Mr. Stevens – a budget shortfall – was actually the reason for eliminating their positions.  A jury should decide whether the city's proffered reason for terminating Mr. Hothem and Mr. Stevens was the actual reason for terminating them.  The city's seeking out information about health care expenses, the highlighting of expenses for employees aged 55 to 64, and the termination of only employees over the age of 55 raises a factual question as to the city's real motive.  Consequently, this court recommends denying the city of Belle Fourche's motion for summary judgment on the plaintiffs' ADEA claims based on purposeful discrimination.

### c.    Disparate Impact Age-Discrimination

In order to establish a *prima facie* case of disparate impact under the ADEA, the plaintiff employee must identify a specific employment practice and then present "statistical evidence of a kind and degree sufficient to show that

the practice in question caused the plaintiff to suffer an adverse employment action." Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 994 (1988).

Mr. Hothem and Mr. Stevens acknowledge that the pool of employees selected for termination in this case is too small to provide statistically significant results for purposes of disparate impact age discrimination and acknowledge that summary judgment is appropriate on this claim.  See Docket No. 67-1 at page 25.  Therefore, this court recommends granting summary judgement on the disparate impact age discrimination claim.

### 2.    42 U.S.C. § 1983 Liability

Mr. Hothem and Mr. Stevens also bring this action against the city and Mayor Schneider pursuant to 42 U.S.C. § 1983 for infringement of their First Amendment rights to free speech.[28]  See Docket No. 1.  This claim centers around the removal of asbestos from the police station in the fall of 2008 and spring of 2009.  Id.

---

[28] Mr. Stevens admitted during deposition testimony that he had "no work contact" with Mayor Schneider and that he had no contact at all with Mr. Pummel during his employment with the city.  See Docket No. 53-13 at page 8 (Stevens' Depo. at 42-43).  Mr. Stevens also testified that he did not speak with either Mayor Schneider or Mr. Pummel regarding removal of the asbestos tiles.  Id. At page 9. (Stevens Depo. at 53-54).  Thus, while both Mr. Hothem and Mr. Stevens assert violations of their First Amendment rights, it is clear from the record that the only individual to make any statements was Mr. Hothem.

The Eighth Circuit has held that "a public employee alleging a violation of the right to free speech must show that the speech in question is entitled to the protections of the First Amendment because it addresses a matter of public concern." Kozisek v. County of Seward, Nebraska, 539 F.3d 930, 936 (8th Cir. 2008) (citing Buazard v. Meridith, 172 F.3d 546, 548 (8th Cir. 1999)). "Whether an employee's speech addresses a matter of public concern is determined by the content, form, and context of the speech, and that speech must relate to some matter of political, social or other community concern." Kozisek, 539 F.3d at 936. "Although the First Amendment protects some expressions related to the speaker's job, it does not protect expressions made as part of the employee's job duties." Kozisek, 547 U.S. at 937 (citing Garcetti v. Ceballos, 547 U.S. 410, 421 (2006). "In order to establish a claim of unlawful First Amendment retaliation, a public employee must show that he suffered an adverse employment action that was causally connected to his participation in a protected activity." Dahl v. Rice County, Minn., 621 F.3d 740, 744 (8th Cir. 2010) (quoting Duffy v. McPhillips, 276 F.3d 988, 991 (8th Cir. 2002)).

Mr. Hothem claims that he engaged in protected speech on two separate occasions when he expressed to Mayor Schneider and Mr. Pummel that he did not want he and his staff to remove the carpeting and tiles containing asbestos. Mr. Hothem and Mr. Stevens assert that they were not speaking on a matter

related to their job duties because their job duties only included maintaining, repairing, and cleaning physical structures and that demolition and asbestos removal were not in that job description.  See Docket No. 67-1 at page 30. Mr. Hothem and Mr. Stevens argue that their "concerns about removal of the asbestos had to do with their personal health concern, those of the citizens who might be in the building and subjected to the dust and for the asbestos being disposed of improperly."  Id. at pages 30-31.  Mr. Hothem and Mr.Stevens argue that their speech was both internal, when they expressed their concerns to Mayor Schneider and Mr. Pummel, and external, when they contacted the state about the process of removing the asbestos and contacted outside contractors to obtain bids for removing the asbestos.  Id. at page 31. Finally, Mr. Hothem and Mr. Stevens asserts that at least two other individuals called the state to complain about the dust from the removal of asbestos and that Mayor Schneider questioned some participants about who notified the DENR about the asbestos removal.  Id. at page 26.

The city admits that asbestos removal was not written explicitly into Mr. Hothem's and Mr. Stevens' job descriptions, but the city argues that regardless of whether it was in their job description, their speech was made as public employees pursuant to their job duties and not as private citizens.  See Docket No. 91 at page 43.  As evidence of this the city points to the fact that Mr. Hothem obtained two bids for removing the asbestos and took them to

Mayor Schneider and Mr. Pummel to review.  Additionally, Mr. Hothem made a call to the state, not to complain or express concern about removing asbestos, but to obtain information on properly removing asbestos.  Id. at 44-45.

The Supreme Court, in Garcetti, noted that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." Garcetti, 547 U.S. at 424-25.  Thus, the explicit provisions of the job duties outlined in Mr. Hothem's and Mr. Stevens' job descriptions are not determinative of whether they were making expressions related to their employment duties.

In this case, it is Mr. Hothem's contention that he was not acting within the course of his duties as an employee for the city because asbestos removal was not specifically listed in his job description.  The city does not deny that asbestos removal was not listed in Mr. Hothem's job description, but they argue that it was not listed in any job description.  See Docket No. 87 at ¶ 135 (City's response).  The city admits that the asbestos removal job should have gone through the city engineer's office, but that it was still within the purview of the custodial/maintenance department.  Id.  Although, Mr. Hothem's job description does not contain specific language regarding the removal of

asbestos, it does indicate that he was under the supervision of the mayor and was to perform "other duties as deemed appropriate and necessary."  Based on these facts, the court cannot say that assisting with removal of carpet and tiles was not within Mr. Hothem's and Mr. Stevens' job descriptions.

With regards to whether Mr. Hothem's speech was made as a citizen or an employee, it is clear that the presence of asbestos and the utilization of proper procedures for removing asbestos is a matter over which citizens would have concern.  The interest of the public in this topic, however, does not establish that Mr. Hothem's speech was constitutionally protected.  See Schilcher v. Univ. of Arkansas, 387 F.3d 959, 963 (8th Cir. 2004)  In Schilcher, the Eight Circuit held that "[I]t is not enough to say that a particular topic or subject is, at some level of abstraction, a matter of public concern."  Id. Rather, the court "must analyze the content, form, and context of the speech to determine whether the speaker was acting primarily as a concerned citizen or as an employee."  Id.  "If the speech [is] mostly intended to further the employee's private interests rather than to raise issues of public concern," [his] speech is not protected, even if the public might have an interest in the topic of [his] speech."  Id.

Significantly in this case, Mr. Hothem did not act upon nor did he publicize his concern regarding removal of the asbestos tiles from the police station.  When Mr. Hothem expressed his concerns about asbestos, he did so

only to his supervisors, Mayor Hothem and Mr. Pummel.  Mr. Hothem never

called the state for anything other than asking for instructions on how to

remove the asbestos tiles and to determine the proper procedures to follow.[29]

Mr. Hothem asserts that getting two outside bids to perform the asbestos

removal is evidence that he expressed concern to individuals other than

Mayor Schneider and Mr. Pummel.  However, it was one of Mr. Hothem's duties

as the custodial/maintenance supervisor to coordinate with the city finance

officer on bid specifications and quotes for items related to city buildings.  See

Docket no. 74-4 at page 1.  Additionally, Mr. Hothem contracted work out on

several other occasions, so the fact that he obtained bids for removal of the

asbestos tiles was not out of the ordinary.[30]  Mr. Hothem testified at his

deposition that he told Mr. Pummel that he "really didn't want to handle

asbestos."  See Docket No. 53-12 at page 18 (Hothem Depo. at 122).  However,

there is no indication, as Mr. Hothem now claims, that he was concerned for

the health of other citizens who might be in the building and for the asbestos

---

[29] Mr. Hothem testified at his deposition that he never contacted the state
regarding the work that he was doing and did not ask anybody to call the state.
See Docket No. 53-12 at page 19 (Hothem Depo. at 125-26).  Mr. Stevens
testified at his deposition that the only call that was made was to determine the
proper procedure for removing the tiles.  See Docket No. 53-13 at page 9
(Stevens' Depo. at 56).

[30] The city approved bills for painting contracted services in December of
2008, January 2009, February 2009, March 2009, and April 2009.  See Docket
No. 76-3 at pages 4-9.

being removed improperly.  If Mr. Hothem was concerned, the record does not reflect that he expressed that concern to either Mayor Schneider or Mr. Pummel nor to any authority outside of the city.

The court finds that the form and context of Mr. Hothem's speech regarding removal of the asbestos tiles indicates that he was not speaking as a concerned citizen but rather speaking and functioning as an employee who was performing his job and who was expressing his opinion regarding the practices of the city.  See de Llano v. Berglund, 282 F.3d 1031, 1036-37 (8th Cir. 2002) (holding that although employee's letters touched on a matter of public concern, the employee's speech related specifically to the ongoing feuds he was having with defendants and that the dispute was private to him and not a matter of public concern); Bausworth v. Hazelwood School Dist., 986 F.2d 1197, 1199 (8th Cir. 1993) (holding that although the content of the plaintiff's speech was a matter of concern, the speech's form and context show that the plaintiff conveyed the speech in the course of acting as an employee).

Additionally, the court finds, in the alternative, that even if the speech at issue is constitutionally protected, the facts do not establish that Mr. Hothem's speech was a substantial factor in the city's decision to eliminate his and Mr. Stevens' positions and to terminate them.  Mr. Hothem and Mr. Stevens assert that Mayor Schneider was upset about the two calls to the DENR and that his displeasure resulted in the termination of Mr. Hothem and

Mr. Stevens.  See Docket No. 67-1 at page 35.  However, it is apparent by a

number of e-mail exchanges that the council believed that Mayor Schneider did

not want Mr. Hothem's and Mr. Stevens' positions eliminated and that the

council believed Mayor Schneider was going to be an obstacle in carrying forth

their proposed plan.[31]  See Docket Nos. 99-1 at pages 1, 7, 10, 13; 99-2.

Additionally, there is no indication that Mr. Pummel or Mayor Schneider

were upset about Mr. Hothem presenting them with the bids for asbestos

---

[31] On August 31, 2009, Mr. Pummel sent an e-mail to the city Finance
Officer indicating that he thought he had support to dissolve the maintenance
department, but that he was concerned that Mayor Schneider may oppose it.
See Docket No. 99-1 at page 1.  On September 10, 2009, Mr. Pummel sent
another e-mail to the city Finance Officer indicating that Mayor Schneider still
believed that the city should keep Mr. Hothem employed and that it was "Not
Happening."  Id. at page 7.  On September 11, 2009, Mr. Pummel sent an e-
mail to Betty Jo Jorgensen, Mayor Schneider's assistant, advising her not to
advertise for a replacement employee in the public works department because
"its not a done deal with Dennis Hothem and Kendall Stevens."  Id. at page 10.
Mr. Pummel further explained to Ms. Jorgensen that he expected to "hit a snag
on that."  Id.  Mr. Pummel explained, "Your boss [Mayor Schneider] does not
want to make the restructuring effective immediately; in fact I'm sure he is
going to want to rehash the whole concept hoping enough people will change
their mind so we can keep Dennis [Hothem] employed."  Id.  On September 11,
2011, Ms. Jorgensen replied to Mr. Pummel saying that Mr. Hothem himself
had said that "as long as the Mayor was still here- He would have a job!"  Id.
On September 23, 2009, Mr. Pummel sent an e-mail to council member Linda
McElwain implying to her that the mayor's veto of a council decision to give
employees a pay raise was a back door attempt to save Hothem's employment
and indicating "We have to keep the Mayor's friends employed."  Id. at page 13.
Finally, on October 19, 2009, Mr. Pummel sent another e-mail to council
member Linda McElwain informing her that he intended to discuss Mr. Hothem
at that evening's council meeting and indicating that "I'm sure it will anger the
mayor."  See Docket No. 99-2.

removal.  Mr. Hothem testified during his deposition that there was no friction between himself and Mayor Schneider when they were discussing the bids, that neither Mayor Schneider nor Mr. Pummel seemed upset, and only indicated that the city could not afford to pay the price of the bids.  See Docket No. 53-12 at page 18 (Hothem Depo. at 123-24).

Finally, the timing of Mr. Hothem's and Mr. Stevens' discharge is not sufficient to establish retaliation.  The "temporal proximity between the protected activity and the alleged retaliatory act must generally be very close." Heaton v. The Weitz Co., Inc. 534 F.3d 882, 888 (8th Cir. 2008); see, e.g., Hite v. Vermeer Mfg. Co., 446 F.3d 858, 866 (8th Cir. 2006) (noting that "[c]ases in which [courts] have determined that temporal proximity alone was sufficient to create an inference of the causal link 'have uniformly held that the temporal proximity must be very close.' ") (quoting Wallace v. Sparks Health Sys., 415 F.3d 853, 859 (8th Cir. 2005)).  In this case, Mr. Hothem's call to the state to determine the proper procedure for asbestos removal and his action in obtaining outside bids to perform asbestos removal occurred in January of 2008.  No adverse employment action was taken against Mr. Hothem and Mr. Stevens until September 8, 2009,[32] nearly two years after the events which

_____

[32] September 8, 2009, was the date in which the city council took action to eliminate Mr. Hothem's and Mr. Stevens' positions.  It was not until November 16, 2009, that Mr. Hothem and Mr. Stevens were actually terminated.

Mr. Hothem and Mr. Stevens claim they were terminated for.  This tends to refute Mr. Hothem's and Mr. Steven's assertion that they were terminated as a result of calling the state to obtain instructions on asbestos removal and obtaining outside bids for others to perform the work.

Based on the record before the court and viewing the facts in the light most favorable to Mr. Hothem and Mr. Stevens, there is no genuine issue of material fact regarding whether the city eliminated the positions of Mr. Hothem and Mr. Stevens in retaliation for their expression of displeasure regarding the removal of asbestos tiles.  The record indicates that Mr. Hothem was not acting as a private citizen when he took the bids to Mayor Schneider and Mr. Pummel, nor when he expressed to them that he did not really want to remove the tiles.  Rather, Mr. Hothem was acting in the course of his duties as custodial/maintenance supervisor.  Furthermore, the record contains no evidence to support a finding that Mr. Hothem's expression of displeasure was a substantial or material factor in the city's decision to eliminate his and Mr. Stevens' positions.  Therefore, this court recommends granting summary judgment in favor of the city and Mayor Schneider on this claim.

### 3.    Wrongful Discharge - Violation of Public Policy

Mr. Hothem and Mr. Stevens also claim that they were wrongfully discharged in violation of South Dakota public policy.  See Docket No. 1. Specifically, Mr. Hothem and Mr. Stevens alleged that the city and

Mayor Schneider discharged them for "speaking out in the form of a report to the State, securing bids to perform a job safely[,] and advising those in charge of the concerns," and daring to object to the city's request to remove and dispose of asbestos.  See Docket No. 67-1 at page 36.

"South Dakota is an employment-at-will state."  Aberle v. Aberdeen, 2006 S.D. 60 at ¶ 8, 718 N.W.2d 615, 621 (S.D. 2006) (citing SDCL § 60-4-4). Therefore, "an employment having no specified term may be terminated at the will of either party."  Id.  However, there are certain public policy exceptions to this rule.  The South Dakota Supreme Court has recognized a cause of action for employees under the public policy exceptions for: (1) termination for "refusal to commit a criminal or unlawful act"; (2) termination in retaliation for "filing a worker's compensation claim"; and (3) termination in retaliation for whistleblowing that serves a public purpose.  Dahl v. Combined Ins. Co., 2001 S.D. 12 at ¶¶ 6, 12, 621 N.W.2d 163, 166-67 (S.D. 2001).  In Emery v. Schneider, 2009 WL 236686, *10 (D.S.D. 2009), the district court found a fourth public policy exception to the at-will employment doctrine for termination in retaliation for exercise of First Amendment rights "to petition the government for redress of grievances" and freedom of speech.

Assuming that the public policy exceptions would extend to objecting to violating the law on proper procedures for asbestos removal, the record does not indicate, as discussed above, that Mr. Hothem and Mr. Stevens were

64

terminated in retaliation for expressing their opinions regarding removing asbestos from the police station.  Mr. Hothem and Mr. Stevens assert that they were terminated for "speaking out in the form of a report to the state, securing bids to perform a job safely, and advising those in charge of the concerns."  See Docket No. 67-1 at page 36.  However, neither Mr. Hothem nor Mr. Stevens ever made any report to the state regarding the asbestos removal; rather, Mr. Hothem called the state to determine the proper removal procedure for asbestos.  See Docket No. 53-13 at page 9 (Stevens Depo. at 56).  Mr. Hothem also testified at his deposition that he never contacted the state regarding the work that he was doing and did not ask anybody else to call the state.  See Docket No. 53-12 at page 19 (Hothem Depo. at 125-26).  Finally, Mr. Hothem testified that there was no friction between him and Mayor Schneider regarding the bids to remove the asbestos and that Mr. Pummel likewise was not upset about Mr. Hothem obtaining the bids.  As for Mr. Stevens, by his own admission he never had any contact with Mayor Schneider nor Mr. Pummel regarding the removal of asbestos.

There is not sufficient evidence in the record to create an issue of material fact as to whether Mr. Hothem and Mr. Stevens were terminated as a result of the issues surrounding the removal of asbestos from the police department.  Therefore, this court recommends granting summary judgment in favor of the city and Mayor Schneider on this claim.

**C.**     **Mayor Dave Schneider's Motion for Summary Judgment**

    **1.**     **Liability of Mayor Schneider Under 42 U.S.C. § 1983**

    Mr. Hothem and Mr. Stevens assert that the suit against Mayor Schneider in his official capacity is just "another way of pleading an action against an entity of which an officer is an agent." See Docket No. 93 at page 11 (citing Monell v. Dep't of Social Serv., 436 U.S. 658, 690 n. 55 (1978)). Mr. Hothem and Mr. Stevens also acknowledge and "agree that 'the real party in interest in an official-capacity suit is the governmental entity and not the named official.' " See Docket No. 93 at page 11 (citing Hafer v. Melo, 502 U.S. 21, 25 (2007).  However, Mr. Hothem and Mr. Stevens maintain that summary judgment against Mayor Schneider is not appropriate for the same reasons as set forth in their claims against the city.  See Docket No. 93 at page 12.

    "A suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity." Veatch v. Bartels Lutheran Home, 627 F.3d 1254, 1257 (8th Cir. 2010).  Therefore, Mr. Hothem's and Mr. Stevens' claims against Mayor Schneider in his official capacity are the equivalent of a suit against the city of Belle Fourche. Mr. Hothem and Mr. Stevens admit that the city is the real party in interest. See Docket No. 93 at page 11.  In Veatch, the Eighth Circuit affirmed the district court's dismissal of a claim against a government employee.  Veatch, 627 F.3d at 1257.  In affirming the district court's grant of summary judgment

for the employee, the Eighth Circuit held that because the government employee was sued in his official capacity, any suit against the employee was "merely a claim against the City." Id. at 1256.  Therefore, the court held that the claim against the employee was "redundant of the claim against the City." Id. at 1257; see also Will v. Michigan Dept. of State Police, 491 U.S. 58, 70-71 (1989) (holding that a "suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself.") (citations omitted).

In this case, Mr. Hothem and Mr. Stevens are not alleging anything different against Mayor Schneider in his official capacity then they are against the city.  See Docket No. 93 at pages 11-12.  Rather, Mr. Hothem and Mr. Stevens assert that summary judgment against Mayor  Schneider in his official capacity is not appropriate for the same reasons as set forth in their memorandum in opposition to the city's motion for summary judgment.  Id. Thus, any claim against Mayor Schneider in his official capacity is redundant of the claims already asserted against the city.  See Veatch, 627 F.3d at 1256-57.  Therefore, this court recommends granting summary judgment in favor of Mayor Schneider on the official-capacity claims.

### 2.      Liability of Mayor Schneider Under the ADEA

Mr. Hothem and Mr. Stevens assert that the city is liable under the

ADEA and that Mayor Schneider is also liable by proxy.  See Docket 93 at page

12-13.  Mayor Schneider asserts that, under the ADEA, the term "employer"

does not provide for individual liability.  See Docket No. 59 at page 3.

Under the ADEA, the term "employer" means a person "engaged in an

industry affecting commerce who has 20 or more employees for each working

day in each of twenty or more calendar weeks in the current or preceding

calendar year..."  29 U.S.C. § 630(b).  The Eighth Circuit does not appear to

have squarely addressed the issue of whether the term "employer" as used in

the ADEA provides for individual liability.  However, the district courts within

the Eighth Circuit "have found consistently that supervisors and managers

cannot be held individually liable under the ADEA because they are not

'employers' within the meaning of the statute."  Nelson v. County of Dawes,

Nebraska, 2008 WL 486592, *8 (D. Neb. 2008); see also Pierce v. Washington

County Central Dispatch 911, 2007 WL 4270669, *5 (E.D. Mo. 2007) (finding

that "the ADEA does not provide for individual liability"); Smith v. Bankers Life

and Casualty Co., 519 F. Supp. 2d 964, 967 (S.D. Iowa 2007) (same); Feller v.

McCarthy, 2007 WL 3204463, *3 (D. Neb. 2007) (holding that "individual

supervisors and business managers are not 'employers' under the ADEA");

Weller v. Legal Aid of Western Missouri, 2005 WL 2090781, *5 (W.D. Mo. 2005)

(finding "that there is no individual liability under either the ADEA or Title VII"); Taylor v. Wright, 2005 WL 2033422, *3 (E.D. Mo. 2005) (noting that "district courts within [the Eighth Circuit] have declined to hold individuals liable under the ADEA"); Beckler v. Schweigert Bros., Inc. 2004 WL 1240964, *1 (E.D. Mo. 2004) (same).

Additionally, courts of appeals in other circuits have reached the same conclusion.  See, e.g., Stults v. Conoco, Inc., 76 F.3d 651, 655 (5th Cir. 1996) (holding "that the ADEA provides no basis for individual liability for supervisory employees"); Csoka v. United States, 1996 WL 467654, *5 (7th Cir. 1996) (holding that the "ADEA, like Title VII, does not authorize individual liability claims"); Smith v. Lomax, 45 F.3d 402, 403 n.4 (11th Cir. 1995) (holding that individuals are not liable under the ADEA); Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 511 (4th Cir. 1994) (holding that the ADEA limits civil liability to the employer and does not provide for individual liability); Miller v. Maxwell's Int'l, Inc., 991 F.2d 583, 587 (9th Cir. 1993) (noting that "Congress did not intend to impose individual liability on employees" under the ADEA).

Though the Eighth Circuit has yet to explicitly hold that individual liability cannot be had under the ADEA, it has "squarely held that supervisors may not be held individually liable under Title VII." Bonomolo-Hagen v. Clay Central-Everly Community School Dist., 121 F.3d 446, 447 (8th Cir. 1997). Furthermore, the term "employer" is defined similarly in Title VII and in the

69

ADEA.  Compare 42 U.S.C. § 2000e(b) with 29 U.S.C. § 630(b).  Therefore, "it is highly likely that the Eighth Circuit will find, when presented with the question, that supervisors cannot be held individually liable under the ADEA." Nelson, 2008 WL 486592 at *8.  Based on the foregoing authorities, this court recommends granting summary judgment in favor of Mayor Schneider on Mr. Hothem's and Mr. Stevens' claims under the ADEA as Mayor Schneider does not fall within the definition of "employer" under the ADEA.

### 3.    Liability of Mayor Schneider for Wrongful Discharge - Violation of Public Policy

The court has already discussed the Mr. Hothem's and Mr. Stevens' wrongful discharge in violation of public policy claim above.  For the same reasons stated above, the court recommends granting summary judgment in favor of Mayor Schneider.

### CONCLUSION

With respect to the defendant City of Belle Fourche's motion for summary judgment [Docket No. 47], this court respectfully recommends denying the city's motion for summary judgment on the plaintiffs' age discrimination claim based on purposeful discrimination.  The court respectfully recommends granting the city's motion for summary judgment on: (1) the plaintiffs' civil rights (42 U.S.C. § 1983) claim; (2) the plaintiffs' wrongful

70

discharge in violation of South Dakota public policy claim; and (3) the plaintiffs' disparate impact claim under the ADEA.

With respect to defendant Dave Schneider's motion for summary judgment [Docket No. 57], the court recommends granting summary judgment in favor of Mr. Schneider on all plaintiffs' claims.

### NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained.  See also Fed. R. Civ. P. 72(b)(2).  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require *de novo* review by the district court.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated January 10, 2012

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE